IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RAYMOND N. HAMEL, SR., | ) | 4:08CV3066 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This is the second appeal filed by the plaintiff, Raymond N. Hamel, Sr., from the Commissioner's denial of his application for disability insurance benefits under Title II of the Social Security Act.  Hamel has been diagnosed with degenerative disc disease and depression.  In the first appeal, Case No. 4:03CV3196, this court reversed the Commissioner's decision and remanded for further proceedings after finding that the Administrative Law Judge (ALJ) had not properly assessed Hamel's complaints of back pain and leg numbness, and had failed to give any consideration to the opinion of a clinical social worker that Hamel's depression often interferes with his attention and concentration, which a vocational expert testified would preclude all employment.  The court specifically instructed that "[o]n remand, if the ALJ again chooses to discredit Hamel's testimony, or to disregard [the clinical social worker's] opinion, he should detail his reasons for doing so." (Case No. 4:03CV3196, filing 19 at 10.)  The ALJ on remand made a somewhat more detailed assessment of Hamel's credibility, but made no mention whatsoever of the clinical social worker's opinion, even though a second vocational expert again testified that a person with Hamel's other impairments could not work if he often had trouble concentrating.  Reversal is therefore required.  The court will not order the payment of disability benefits, but will again remand the case to the Commissioner with the request that administrative proceedings on remand be expedited as much as possible.

# I.  BACKGROUND

Hamel, who is now 50 years old, applied for Title II benefits on July 28, 2000, alleging that he became disabled on August 15, 1998, because of "spinal disk condition, limited motion cervical spine, unemployability."  (Tr. 119, 141)  His application was denied initially on September 28, 2000, and on reconsideration on January 4, 2001.  (Tr. 95, 101)

Hamel requested a hearing, which was held on August 10, 2001.  Testimony was provided by Hamel and by a vocational expert called by the ALJ.  (Tr. 41-87)  On February 5, 2002, the ALJ issued a decision finding that Hamel is not entitled to a period of disability or to the payment of benefits under Title II.  (Tr. 16-34)  In reaching this decision, the ALJ evaluated Hamel's claim according to the five-step sequential analysis prescribed by Social Security regulations, 20 C.F.R. § 404.1520.

First, the ALJ found no evidence that Hamel had engaged in any substantial gainful activity since the alleged onset of disability.  Second, the ALJ found that Hamel has severe medically determinable impairments,[1] namely, "degenerative disc disease with radiculopathy and depression."  Third, the ALJ found that such impairments do not meet or equal those listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (the "listings").  Fourth, the ALJ found that Hamel is unable to perform his past relevant work as a gas station attendant, an automobile mechanic helper, a maintenance service dispatcher (as he performed the job), and a service installation technician.  Fifth, and finally, the ALJ found that Hamel has the residual functional capacity ("RFC") to work as a dispatcher, as that job is performed in the national economy, and for other work that exists in the regional and national economies in significant numbers, including work as a phone solicitor and cashier.

---

[1] A medically determinable impairment is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1521.

-2-

As part of step four of the analysis, the ALJ was required to assess Hamel's credibility. That assessment was as follows:

> At the hearing, the Claimant testified that he feels that he has been unable to work since August 15, 1998, which is the date of the Veterans Administration's decision in which he was "given 100% disability" and when he closed his business. He hasn't worked since that time and has been receiving Veterans Administration disability benefits. He testified that he is disabled by continued chronic back and neck pain with radiculopathy into his left leg and fatigue. In addition, he has been treated for depression and sees a mental health counselor "regularly."

> With regard to medications, he indicated that he is on medications for pain and depression and he uses self-hypnosis. Periodically, he wears a brace on his left leg because he sometimes experiences numbness and a feeling like he is on "pins and needles." Oftentimes, he will have to lie down. On a scale of 1-10 (10 being the highest level of pain), the Claimant indicates that he experiences "constant" back pain and that at the lowest, his pain is at the 5 to 7 level. In fact, because he has had to deal with this pain for years, he feels that he has developed a higher tolerance for pain.

> With regard to his emotional difficulties, the Claimant testified that he experiences depression, is moody and short tempered. He testified that he has gotten to be "a lone wolf" and because he has been "very restrictive" with his children, they don't talk to him very much any more. The medication for depression does give him some relief and that [sic] it puts thoughts of suicide "to the back of the mind."

> With regard to his abilities and limitations, the Claimant indicated that he is able to stand between 5-10 minutes before needing to sit, recline, or "just move around the room for 30 minutes" before he is able to stand again. He is able to set in a straight chair for between 15-20 minutes. His walking is very limited. Noting that his doctors have limited his lifting to 40 pounds, he indicated that he could probably lift that amount but it would be for a short period and he could not do it for a whole day. Occasionally, the Claimant uses a cane although he indicated that he

-3-

2em

doesn't feel comfortable using it, because he doesn't want to depend on it too much.

With regard to his activities of daily living, the Claimant indicated that he tries to teach himself "light" woodworking and he tries to maintain his vehicles "on a hobby level." These activities can be done at approximately one and a half hour intervals. As an example, he indicated that it has taken him one and a half years to tear down an engine on a pickup. Another hobby includes collecting coins.

* * *

The chronological review of the progress notes from the Veterans Administration indicates that the Claimant's son was, eventually, successfully placed outside of the home. Further, the Claimant and his wife successfully dealt with some minor issues involving their marriage and the changes in family dynamics with the three sons gradually leaving the home. When he became involved in treatment, results of the Beck inventory indicated that his depression was moderate and in a recent report dated March 9, 2001 his treating psychologist, Ms. Crandall [sic],[2] indicated that his depression was now "mild." Further, she noted, "The depression likely does not overtly limit him from working." There are several notes in the file referring to the Claimant working on repairing a vehicle and another note indicating "Currently works part-time repairing juice machines." At one point, the Claimant was getting more equipment for his shop and, at another point, he was transporting his family back and forth to Grand Island (a 3-hour trip). Further, he has gone on trips to Texas and on a 24-hour trip to Minot. It was noted in a progress note at Exhibit 13F, page 17, that he was in a bind because he was making more money in VA disability benefits than he would be-able to make in most jobs.

There are varying reports as to the Claimant's Veterans Administration's rating of disability. Nonetheless, the Social Security Administration is not bound by the findings of the Veterans Administration regarding

---

[2] Merrill D. Crandall, ACSW/LCSW.  Mr. Crandall has counseled Hamel on a regular basis since August 1998.

disability and the Social Security Administration and the Veterans Administration define disability differently. Fortunately, it appears that the Claimant responded well to medication and therapy with regard to his depression and anxiety.

With regard to his physical condition, a recent MRI of the lumbar spine revealed only degenerative disc disease. EMG testing indicates radiculopathy, however, the Claimant has only received medication for his chronic back and leg pain. He has not gone through any physical therapy or a work hardening program and none has been recommended. Likewise, no surgical intervention has been recommended. In fact, the only recommendation has been a 40 pound weight restriction.

In view of the preceding discussion, the undersigned Administrative Law Judge finds that the Claimant's testimony, insofar as it pertained to the inability to perform any type of work activity on a sustained basis, was not credible.

(Tr. 28-30)

Hamel's request for a review of the ALJ's decision was denied by the Appeals Council on July 5, 2002. (Tr. 11) His complaint in Case No. 4:03CV3196 was filed in this court on May 28, 2003, within the extended filing period granted by the Appeals Council. The court's judgment reversing the ALJ's decision and remanding the case for reconsideration of Hamel's credibility and reevaluation of his RFC was entered on April 7, 2004. On July 29, 2004, the Appeals Council entered an order directing an ALJ to provide Hamel with an opportunity to appear at a hearing, develop the record pursuant to 20 C.F.R. §§ 404.1512-404.1518, and issue a new decision. (Tr. 1168-69)

The same ALJ was assigned to the case on remand, and a supplemental hearing was held on May 25, 2005. Additional exhibits were received in evidence and testimony was provided by Hamel, his wife, and another vocational expert. (Tr. 1177, 1611-1666) After the hearing, the ALJ requested Hamel to submit to consultative

examinations by a state agency psychologist and physician. (Tr. 1196-97, 1537-56, 1665)  The ALJ's adverse decision was issued on October 20, 2005.  (Tr. 1138-56) Hamel requested administrative review of the ALJ's decision, but the Appeals Council declined jurisdiction 27 months later, on February 5, 2008.  (Tr. 1126-29)

Hamel's complaint in the present court action was timely filed on April 2, 2008.  The Commissioner answered and filed a certified copy of the administrative transcript on September 19, 2008.  Briefing was completed on March 5, 2009.

### A.  Hamel's Medical History

As identified by the parties in their briefs, Hamel's relevant medical history includes the following entries, listed in chronological order:

March 26, 1997:  A CT scan of the lumbar spine showed "[a]t the L5/S1 level, there is a broad diffuse disc bulge.  This effaces the anterior aspect of the thecal sac. Furthermore, there is focal disc herniation in the left lateral recess at this level which impinges upon the exiting nerve root."  (Tr. 285)

August 18, 1997:  Hamel requested a knee brace that would fit over his clothes. He reported doing well with his current brace.  (Tr. 523)

September 10, 1997:  Jackson J. Bence, M.D. stated in progress notes: "In summary, he has degenerative disk disease at L2/3, L3/4 and L5/S1.  He has moderate arthritis involving his lower lumbar spine.  He has disk bulging at L2/3 and ¾.  It is my opinion that his back care in the future should be conservative. It is my opinion that he should restrict his lifting to a 40 pound limit.  Treatment in the future should be conservative by nonsteroidal anti-inflammatory medications and pain medications as necessary."  (Tr. 518)

January 23, 1998:  The Department of Veteran's Affairs increased Hamel's disability rating from 20 percent to 60 percent.  The VA's rating decision stated: "The evaluation of the low back condition, to include neuropathy of the left lower extremity, is increased to 60 percent disabling effective March 20, 1997. An evaluation of 60 percent is granted whenever there is pronounced intervertebral disc syndrome with persistent symptoms compatible with sciatic neuropathy, characteristic pain and demonstrable muscle spasm absent ankle jerk or other neurological findings appropriate to site of diseased disc and little intermittent relief. . . . The veteran was referred by the Neurology Clinic on 03-20-97 for a left knee brace to prevent the knee from giving way. Treatment note dated 04-25-97 reports that the veteran received his knee brace to prevent buckling secondary to neuropathy." (Tr. 289)

May 29, 1998:  Hamel had a psychiatry consultation with Rey de los Angeles, M.D., whose assessment was adjustment disorder with mixed anxiety; personality disorder, not otherwise specified; no PTSD; and Global Assessment of Functioning (GAF) of 70/70.[3]  The doctor continued Hamel's prescription for Wellbutrin. (Tr. 512)

---

[3] Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  A GAF of 61 through 70 is characterized by some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 32-34 (4th ed. 2000) (DSM-IV-TR).

July 24, 1998:  Hamel saw his therapist.  He reported feeling useless, a depressed mood, decreased motivation, disturbed sleep, and past suicidal ideation. He stated that Wellbutrin, an antidepressant, was helpful and he was not experiencing side effects.  The therapist noted that Hamel was pleasant and cooperative with neutral mood and a fairly bright affect.  He made good eye contact and his thoughts were organized and clear. The therapist opined that Hamel had a "fair" response to the medication, but noted that he had situational factors which impacted his mood. (Tr. 502)

August 3, 1998:  The Department of Veteran's Affairs issued another rating decision, concluding that Hamel was entitled to individual unemployability effective March 20, 1997.  This decision stated: "Entitlement to individual unemployability is granted because the claimant is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities."  (Tr. 288)

August 10, 1998:  Hamel and his two sons saw a different therapist, Merrill Crandall, ACSW/LCSW.  Hamel was tearful while he discussed his 19-year-old disabled son, who required significant care. (Tr. 500) August 31, 1998:  Hamel saw Mr. Crandall again, and was described as "quite talkative and loud."  Mr. Crandall noted that Hamel's affect was manic, yet he continued to claim that he felt down. Hamel expressed that his major stressor was the issue of his disabled son.  He also discussed other extended family conflict. (Tr. 498)   September 15, 1998: Mr. Crandall assessed Hamel's GAF at 45 (serious). (Tr. 497)  September 29, 1998: Mr. Crandall found Hamel to be talkative and laughing. The Beck Depression Inventory indicated that his depression was only moderate.  Mr. Crandall opined that Hamel's affect and behavior were not congruent with his feeling statements. (Tr. 496) October 15, 1998:  Mr. Crandall opined that Hamel's affect did not indicate much of a mood issue, but still assessed his GAF at 45 (serious).  (Tr. 494)

November 24, 1998:  Hamel saw Charles P. Sprague, M.D., a psychiatrist. Mental status evaluation revealed a dysphoric mood.  Hamel reported that he still had

-8-

"suicidal ideation," but resisted them because he believed suicide was cowardly. Dr. Sprague diagnosed depression not otherwise specified with anxiety, and indicated a GAF of 45 (serious). Hamel and Dr. Sprague discussed that the ongoing stress surrounding his eldest disabled son was detrimental to Hamel and his entire family, causing his younger children to act out. Hamel was no longer able to deal with his eldest son's violent behavior. Dr. Sprague opined that Hamel was benefitting from his ongoing therapy. (Tr. 488)

December 10, 1998: Hamel saw his doctor for follow up on complaints of left leg weakness. Examination revealed tenderness at L5-S1, but straight leg raising was negative. No new treatment was recommended. (Tr. 486)

December 22, 1998: Hamel told Dr. Sprague that he felt fidgety, but had stopped smoking. He reported his mood as "pretty good," but that holiday stress was weighing on him. (Tr. 484)

December 28, 1998: Hamel saw Mr. Crandall for individual therapy. Mr. Crandall observed that Hamel's mood was positive, and Hamel reported that he felt his despair had lessened. Hamel told Mr. Crandall that he had written several hundred dollars in "no fund" checks to give his family a good Christmas. He reported fatigue and difficulty sleeping. Mr. Crandall recommended that Hamel seek a sleep study as his depression issues did not seem that severe. (Tr. 483) January 13, 1999: Hamel's mood was stable and he continued to feel stressed about managing his disabled son. (Tr. 482) January 25, 1999: Hamel's mood was within normal limits, but he stated that he had been feeling down. Mr. Crandall believed that Hamel was a bit more stable. (Tr. 481) February 5, 1999: Mr. Crandall assessed Plaintiff's GAF at 60 (moderate). (Tr. 479) February 18, 1999: Hamel reported that his mood was improving, but that he had experienced some fleeting thoughts of wanting to be dead. GAF was assessed at 45 (serious). (Tr. 478) March 8, 1999: Mr. Crandall noted that Hamel presented with a more depressed mood than he had for several sessions. Hamel blamed his mood on the weather, not being able to work out in his garage, and

conflict at home with his wife and sons.  (Tr. 475)  <u>March 22, 1999</u>:  Hamel was still a bit down on, but reported that he had been doing some car repairs.  (Tr. 471)

<u>April 8, 1999</u>:  Hamel was seen by physical therapy to discuss his knee brace. He reported that his rubber brace was too hot and requested a canvas brace.  (Tr. 466)

<u>April 12, 1999</u>:  Despite continued issues regarding care and placement of his disabled son, Hamel's GAF had increased to 51 (moderate).  (Tr. 465)  <u>April 21, 1999</u>:  Hamel's GAF was 52 (moderate).  (Tr. 464)

<u>April 23, 1999</u>:  Hamel told Dr. Sprague that he was less mean, less irritable, and probably more energetic with his medications.  He did report, however, that he was having difficulty sleeping.  Dr. Sprague prescribed a sleep aid.  Mental status evaluation showed that Hamel appeared more relaxed, his mood was pretty good and more positive, and he had experienced only one episode of death wish since adding a new medication.  Dr. Sprague opined that Hamel was doing much better on double antidepressant therapy.  (Tr. 462)

<u>May 11, 1999</u>:  At a therapy session with Mr. Crandall, Hamel was initially silly and not focused, but then began discussing his part-time job finding placements for foreign exchange students.  His disabled son was participating and doing well in a day program, and would be spending his first weekend away from home.  (Tr. 459)

<u>May 12, 1999</u>:  Hamel told his physician that he was walking for exercise and had decreased his smoking.  (Tr. 458)

<u>June 2, 1999</u>:  Hamel's therapy session with Mr. Crandall focused almost solely on Hamel's frustrations surrounding his disabled son. (Tr. 455)  <u>June 14, 1999</u>: Hamel's concerns again mostly surrounded his disabled son, but Hamel reported that the supportive services he was receiving from Mr. Crandall and the clinic were

helping him to have fewer anger episodes.  He also reported that his depression was minimal "much of the time." GAF was assessed at 45 (serious).  (Tr. 453)

June 17, 1999:  A neurology clinic note stated that Hamel had left neuralgia or L3-L4 radiculopathy, and intermittent nerve impingement.  (Tr. 451, 1075)

June 23, 1999:  Hamel continued to express emotional difficulty surrounding the placement of his disabled son. Mr. Crandall assessed his GAF at 51 (moderate). (Tr. 449)  July 15, 1999:  Hamel's youngest son returned to counseling with him. Progress was made regarding Hamel's communication style with his child.  (Tr. 442)

July 22, 1999:  Balachandran Wariyar, M.D., discussed with Hamel the results of a magnetic resonance imaging (MRI) scan performed two weeks earlier.  The MRI scan showed "[l]eft lateral disc bulge reaching into the L5-S1 neural foramen and possibly compressing the left exiting L5 nerve root."  The doctor told Hamel it was nonsurgical.  The impingement was due to a small lateral bulging disc. Hamel was instructed to continue wearing his knee brace and lose weight.  (Tr. 281, 439, 1069)

July 26, 1999:  Dr. Sprague described Hamel as pleasant, jocular, and intrusive "as usual."  He noted that Hamel's biggest problem at that time was his sleep disturbance, and increased his sleep aid medication.  (Tr. 438)

July 27, 1999:  Hamel and his youngest son again met with Mr. Crandall. Hamel reported that his mood was "about as stable as has been for several weeks." Mr. Crandall noted that Hamel had a wide range affect and was very verbal.  Hamel discussed continued issues with the placement of his disabled son.  (Tr. 436) September 8, 1999:  Hamel told Mr. Crandall that his disabled son was placed the day before.  Hamel expressed that this was emotionally more difficult than he had expected.  His GAF was 51 (moderate).  (Tr. 431)

-11-

September 24, 1999:  Hamel saw Dr. Sprague for follow-up.  Hamel reported that he stopped taking the prescribed sleep aid due to side effects. He reported that he had been sleeping better and that his mood was "real good" since his disabled son was placed outside the home. Mental status evaluation was unremarkable. Dr. Sprague opined that Plaintiff was doing well on his current medications and working hard in therapy.  (Tr. 421-422)

October 22, 1999:   Mr. Crandall noted that Hamel and his family were continuing to adjust to the outside placement of his disabled son.  Overall, Hamel's depression was less and his marital relationship was stronger. (Tr. 411) November 4, 1999:  Mr. Crandall described Hamel as fairly stable.  (Tr. 409) November 29, 1999: Mr. Crandall noted the Plaintiff had "many financial stressors, and the money will son be less as two sons will likely leave the home by January 2000. Thus his VA check will shrink."  (Tr. 406)  January 4, 2000: After feeling down through the holidays, Hamel commented that he was feeling less down and was taking responsibility to modify his feelings and behaviors to accomplish his goals.  Hamel reported doing many auto repairs, and that the cold and strain had caused him pain in his hips and back. Hamel and his wife were throwing a graduation party for their son, and Mr. Crandall noted that one of Hamel's family's strengths was the way that they honored their children and celebrated their accomplishments.   GAF was 55 (moderate).  (Tr. 399)

January 12, 2000:  Hamel saw Gordon Hrnicek, M.D., for a physical exam. The examination was largely unremarkable.  Hamel was able to lie down and sit up on the examination table with minimal difficulty. He was not wearing any braces or using any assistive devices.  Neurologically, Hamel's reflexes and sensation were "perfectly okay" and he moved about very well. Dr. Hrnicek opined that there was a minimum of objective evidence of disability. He did comment that Hamel's MRI suggested fairly significant disc disease and opined that Hamel should not lift more than 40 or 50 pounds.  Dr. Hrnicek noted that Hamel "seemed very down to me, and

I suspect that the majority of his disability involves mental capacities, and I won't comment about that further at this time." (Tr. 293-294)

January 18, 2000: Mr. Crandall noted that Hamel's self-esteem was increasing. He looked better, and Hamel stated that he felt better.  Hamel was finally able to express that he felt more comfortable now that his disabled son was out of the home. (Tr. 397)

January 21, 2000:  Hamel underwent a consultative psychological evaluation with Barbara C. Schuett, M.A.  The examination was unremarkable, including a specific notation that Hamel's mood was not depressed. Adaptive functioning included Hamel's report that he helped his wife watch the day care children, did yard work and work around the house, and worked on cars depending on how he was feeling. Hamel reported that in the evening he might watch television, work on the computer, or go to the garage and do something there.  He stated that he had recently purchased a bicycle and was going to see if he could ride it.  No difficulty with social functioning was noted. Hamel reported that his psychiatric medications were controlling his symptoms. He was able to concentrate and attend to tasks to completion.  He was able to understand and remember short and simple instructions. He could relate appropriately to co-workers and supervisors, but in a boisterous and immature manner.  He was able to adapt to changes in his life.  Ms. Schuett assessed Hamel's GAF at 55 (moderate) to 65 (mild).  (Tr. 297-302)

January 27, 2000:  Hamel reported during a neurology examination that his back problems were getting better.  Review of an MRI revealed only mild L3-L4 involvement with no stenosis, and Hamel was asymptomatic at that time. Examination showed mild left-sided tenderness.  Heel and tandem toe walking were well executed, and reflexes were equal and symmetric.  (Tr. 394)

March 1, 2000:  Mr. Crandall described Hamel's mood as euthymic and noted that the session began positively. Hamel expressed some good insights, and in a

-13-

controlled manner was continuing to seek information about physical injuries his disabled son recently suffered at the state home. Mr. Crandall noted that Plaintiff's mood was stable overall and assessed a GAF of 55 (moderate). (Tr. 389) <u>March 14, 2000</u>: Hamel reported that he was in a very good mood, and Mr. Crandall noted that Plaintiff was joking and positive. Hamel reported that he was doing more odd jobs around the home which was good for his mood. (Tr. 388)

<u>March 17, 2000</u>: Hamel told his doctor that he was exercising by walking one-half to one mile, three to four times a week. (Tr. 387)

<u>March 21 to July 6, 2000</u>: Hamel continued to see Mr. Crandall, sometimes alone and sometimes with his wife. His GAF score went back and forth from 51 to 55 (moderate). (Tr. 381-86) <u>July 13, 2000</u>: Hamel reported that he had fewer and fewer negative thoughts, and never had thoughts of suicide anymore. Hamel discussed that he was in a "double bind" since he had been rated unemployable, because retraining would be at his own expense. Also, Hamel acknowledged that he made far more money collecting VA disability than he would make at most jobs. (Tr. 380) <u>July 20, 2000</u>: Hamel presented for therapy in a positive mood, and reported that he had no specific new stressors. (Tr. 379) <u>August 7, 2000</u>: Hamel came for therapy with his wife. He appeared relaxed and focused on her needs. (Tr. 378)

<u>August 31, 2000</u>: Hamel underwent a consultative psychological examination with A. James Fix, Ph.D. Mental status examination revealed that Hamel was boisterous and enthusiastic, and he cooperated entirely with the interview, but was dominant at times. Regarding affect and mood, Dr. Fix described Hamel as "emotionally brittle" and "rapidly changeable". Speech was rapid and sometimes far too loud, and thought content often very superficial. Hamel was oriented in all spheres. Dr. Fix opined that Hamel functioned at least in the average range, and possibly significantly above the average range intellectually. He diagnosed depression secondary to medical condition, rule out bipolar disorder with irritability, alcohol dependence in long-term remission. He assessed a current GAF of 50

-14-

(serious), and a highest GAF of 70 (mild).  Hamel described his daily activities. Dr. Fix stated that there did not seem to be severe restrictions of Hamel's activities of daily living, although Hamel did not currently do much during the day. Hamel was able to sustain concentration and attention, and was able to remember and understand instructions. He had the ability to relate to others and could adapt to changes in his environment. (Tr. 331-36)

September 12, 2000:  Hamel and his wife again saw Mr. Crandall for counseling, and Mr. Crandall noted that the tension level between them was very low. GAF was assessed at 55 (moderate). (Tr. 374)

September 13, 2000:  Hamel saw Jane McDonald, M.D., for a consultative evaluation.  Physical examination revealed no evidence of muscle spasm. Neurological examination evidenced that Hamel was able to get on and off of the examination table without a great deal of difficulty.  He participated in range of motion testing with "good enthusiasm," and had "increased two-point" discrimination in the lower bilateral extremities.  Lower extremity reflexes were assessed at 2+/4+ and were symmetric.  There was no evidence of peripheral edema.  There was no gross impairment of Hamel's gait and station, but he was unable to tandem walk and was either unable or refused to walk on his heels and toes. Dr. McDonald noted that there was no evidence of obvious mental illness or retardation. Dr. McDonald reviewed Hamel's July 1999 MRI.  She assessed Hamel as a person "who has a history of a back injury in 1979 and who has evidence of decreased sensation and radiculopathy of his lower extremities bilaterally, as well as a history of chronic pain and discomfort secondary to these symptoms." Dr. McDonald opined that Hamel was disabled secondary to chronic depression and chronic low back pain with decreased mobility, decreased ability to perform work-related activities, inability to sit for long periods of time, and was unable to lift greater than 50 pounds. (Tr. 349-354)

September 15, 2000:  Hamel saw Dr. Sprague.  His mental status evaluation was unremarkable, and Dr. Sprague commented that Hamel was doing fairly well

-15-

managing his depressive disorder.  GAF was assessed at 55 (moderate).  (Tr. 372-373)

September 21 to October 16, 2000: Hamel continued to see Mr. Crandall for individual and marital therapy, and GAF scores were routinely assessed from 51 to 55 (moderate).  (Tr. 368-371)  October 30, 2000:  Hamel's middle son attended the session and had just recently graduated from boot camp in Texas.  Hamel had driven to Texas for the graduation, driven his son home from Texas for a visit, and was planning to drive him to his base in North Dakota after the visit.  Mr. Crandall noted that Hamel was doing a good job parenting.  (Tr. 367)  November 9, 2000: Hamel presented for therapy exhausted from a 24 hour round trip to take his son to North Dakota. Mr. Crandall described Plaintiff's mood as "fairly stable" and assessed GAF at 51 (moderate).  (Tr. 366)  November 17, 2000: Hamel reported that he had been busy transporting his family to and from Grand Island as they only had one car and his wife did not like to drive on winter roads. He expressed concern over not working, but stated that he would lose his VA benefits if he did.  Depression was noted to be mild and GAF was 55 (moderate).  (Tr. 365)  December 11, 2000: Hamel reported that his depression was mild and not present all the time anymore. He was considering reducing therapy frequency.  (Tr. 1050)

December 20, 2000:  Hamel saw his doctor. Examination was within normal limits.  Despite Hamel's reports of loud popping, examination of the neck showed good range of motion, no nodes or masses, and no significant crepitus. (Tr. 1122-1123)

January 18, 2001: Mr. Crandall described Hamel's affect as bland, and noted he was not as open on that day.  His GAF was assessed at 60 (moderate). (Tr. 1048)

January 25, 2001: Hamel was seen in the VA neurology clinic for lower back complaints. Examination was unremarkable.  (Tr. 1056)  January 31, 2001: Findings

-16-

from a bilateral EMG were consistent with L4-5 radiculopathy.  Hamel's doctor recommended that he try to lose 15 pounds by the end of the year.  (Tr. 1055)

February 2, 2001: Hamel's youngest son attended his counseling session with Mr. Crandall.  Hamel stated that he was feeling quite well with regard to mood.  GAF was 61 (mild).  (Tr. 1047)  February 13, 2001: GAF continued at 61 (mild).  Hamel expressed stress over financial issues. (Tr. 1046)  February 27, 2001: Hamel's mood was a bit down, describing disappointment over how his son's wedding went and feelings of inadequacy at not being able to help his mother financially.  (Tr. 1045)

February 12, 2001: A lumbar spine MRI showed slight anterolisthesis of L5 on S1 with the suggestion of bilateral spondylolysis, stable degenerative disc disease at L5-S1 with suspected L5 nerve root impingement in the lateral neural foramen which was stable as compared to a prior study, interval progression of degenerative disc disease at L2-3 with stable disc dehydration at L3-4 and no evidence of neural compromise.  (Tr. 1053)

March 5, 2001: Hamel saw Dr. Sprague. Mental status examination was unremarkable.  No treatment changes were made or recommended.  (Tr. 1044)

March 9, 2001:  Mr. Crandall completed a "mental impairment evaluation" form.  He indicated that Hamel suffers from mild depression which tends to promote isolating and negative thinking.  He noted that Hamel's prognosis was "good" and stated that Hamel had improved with medication and counseling treatment.  He stated that no "overt psychological testing" had been completed in the clinic.  In response to the question, "Does the conditions(s) or impairment(s) described above cause the claimant to be unable to perform his/her previous job or some other similar work?", Mr. Crandall answered, "The Depression likely does not overtly limit him from working–The physical limitations do– & as a result promote some of the despair."  In response to the question, "Could performance of the claimant's former job or other similar work have an adverse effect on his/her impairment(s)?", he answered, "Is

-17-

suspected that if he attempted physical type employment– he would enhance pain which then provokes the emotional aspect of his functioning.  This is a complex cycle."  In response to the question, "Are there any specific activities which might aggravate the claimant's condition(s) or impairment(s)?  If so, how?", he answered, "Not enough information to respond to this– It is known when faced with many stressors– he moves into negative thinking seeing no way to problem solve solutions– which leads to serious despair– He contends that continuous physical demand– leads to immobility. If he was working–  got the back pain– which forced inactivity– likely he would again move into the helplessness state & despair."  In response to the question, "How often does claimant's condition interfere with attention and concentration?", Mr. Crandall put an "X" in the space beside the response of "Often" and added the word "Depression". (Tr. 958-961,993-995)

March 13 to March 28, 2001: Hamel's discussions with Mr. Crandall continued to surround family issues and coping strategies.  GAF was 60 (moderate). (Tr. 1442-1443)  April 23, 2001: Hamel was doing fairly well, but stressed over financial problems and communication issues with his spouse. GAF was assessed at 61 (mild). (Tr. 1034)  May 10, 2001:  GAF score was lowered to 60 (moderate). (Tr. 1441) May 30, 2001: Hamel presented in a serious manner and reported that he and his spouse had a serious disagreement a few days earlier.  He had felt more depression since. (Tr. 1033)

June 4, 2001: Hamel was seen in the VA primary care clinic with complaints of disturbed sleep due to back pain, bilateral leg pain, and left arm discomfort.  He also reported some chest pain the previous day, and sometimes experience shortness of breath.  Examination was unremarkable. (Tr. 1020-1021)

June 5, 2001:  A neurosurgery consultation by Arun-Angelo Patil, M.D., showed that Hamel's straight leg raising was limited to 80 degrees bilaterally. Some weakness of dorsiflexion was noted bilaterally, but Dr. Patil noted this could have been due to pain.  Pinprick sensation was decreased at the outer aspect of the left leg

-18-

An MRI showed mild anterolisthesis at S/1 with possible spondylolysis at S/1, but these findings did not indicate significant change from a 1997 scan. The doctor recommended back exercises and would consider surgical intervention only if the exercises did not help and Hamel's pain became unbearable. (Tr. 1018)

August 2, 2001: Hamel's therapy appointment yielded a GAF score of 57 (moderate). Mr. Crandall noted that Hamel had a more negative attitude which Hamel attributed to family issues. Hamel reported feeling some despair, but did not feel it was serious and believed it would be short-term. (Tr. 1114)

September 4, 2001: Hamel saw a nurse practitioner and complained of bilateral foot discomfort. He reported that he was on full disability, but that he watched his granddaughter, and did his own yard work and mechanical work. His examination was unremarkable. (Tr. 1103-1104)

September 14, 2001: Hamel saw psychiatrist Navdeep Sood, M.D. His affect was of normal range and intensity, and his mood was euthymic. His insight and judgment were good, and memory was intact. Dr. Sood assessed a GAF score of 55 (moderate) and continued Hamel's medications. (Tr. 1099)

October 2, 2001: Mr. Crandall noted that Hamel presented with a more bland affect, seemed irritable, and admitted that his mood was down. He assessed Hamel's GAF at 52 (moderate). (Tr. 1097)  October 24, 2001: Hamel presented with a flat affect, and commented that he was really frustrated and discouraged, and that he feared moving back into a more severe depression. Mr. Crandall indicated he would see Hamel on a more regular basis and again gave a GAF score of 52 (moderate). (Tr. 1093)  November 19, 2001. Hamel presented with less attention toward his personal appearance, and continued to state that he felt stress over the management of the son and due to financial pressures. GAF was 53 (moderate). (Tr. 1091)  December 5, 2001: Hamel's GAF dropped to 42 (serious) after reporting that he had experienced suicidal thoughts and had a plan to use a gun. Mr. Crandall noted that Hamel's affect

-19-

was bland, but his motor activity was normal.  Hamel was future oriented during his session, and reported no overt suicide plan at that time.  (Tr. 1079)

December 13, 2001: Hamel followed up with his psychiatrist and reported that he was having problems with his son. Mental status examination revealed a depressed mood, but no other abnormalities. Dr. Sood diagnosed depressive disorder with a GAF of 50 (serious).  (Tr. 1434)

December 19, 2001: Hamel's therapy session showed a GAF of 51 (moderate) due to continued stress surrounding financial demands made by his son.  Hamel reacted by writing $400 in bad checks to provide a good Christmas for the family. Mr. Crandall noted that while Hamel's depression was more severe, it had reduced a bit at this visit. (Tr. 1432)  January 8, 2002: Hamel reported continued stress with his son.  Mr. Crandall noted that Hamel's depression was increased and gave a GAF of 45 (serious).  (Tr. 1429)  January 29, 2002: Hamel saw Mr. Crandall together with his wife and younger son.  His depression was better and his GAF was 55 (moderate). (Tr. 1428)  February 8, 2002: Mr. Crandall noted that Hamel had received his decision from the ALJ denying his disability and was upset.  His GAF was 42 (serious).  In discussing the ALJ's decision, Mr. Crandall explained to Plaintiff that his mental functioning had improved gradually over the course of time.  (Tr. 1427)

February 13, 2002:  Hamel met with Dr. Sood and was noted to be frustrated and upset over the denial by the ALJ. Dr. Sood rated Hamel's GAF at 50 (serious). (Tr. 1425)

May 15, 2002:  Mr. Crandall noted that Hamel's depression was more pronounced.  Hamel scored 24 on the Beck Depression Scale, which placed him in the moderate range. (Tr. 1408)  July 11, 2002: Hamel told Mr. Crandall that he was doing "fair" and continued to discuss financial worries.  GAF was 57 (moderate). (Tr. 1387) August 22, 2002: Mr. Crandall noted that Hamel was confused because the VA approved his disability, but Social Security turned him down. Hamel stated he felt

-20-

like his country was not recognizing the loss he suffered while serving his country. He had a GAF of 53 (moderate).  (Tr. 1383)  September 5, 2002: Hamel again discussed the Social Security application with Mr. Crandall.  GAF remained at 53 (moderate).  (Tr. 1376)

September 19, 2002: Hamel saw Dr. Sood, and stated that he had gone to North Dakota and had a run in with his middle son, but that things had since settled down. Hamel denied any hopelessness or helplessness, and denied any problems with his sleep, appetite, or energy level.  Dr. Sood assessed his GAF at 60 (moderate).  (Tr. 1375)  Hamel also saw Mr. Crandall, who assessed his GAF at 58 (moderate).  (Tr. 1374)

October 3, 2002 to April 22, 2004:  Hamel continued biweekly counseling sessions with Mr. Crandall. GAF scores fluctuated between 51 (moderate) and 61 (mild), and his issues continued to surround family and finances.  (Tr. 1369-1373, 1357-1360, 1353-1354, 1333-1346, 1315-1320, 1305-1312, 1291-1296, 1286, 1279-1281, 1272-1276)

May 6, 2004:  Hamel was seen by a nurse practitioner for evaluation and management of back pain.  The assessment included: spondylolysis, congenital, lumbosacral region; pain in joint involving pelvic region and thigh; and neuralgia, neuritis, and radiculitis.  (Tr. 1267-1269)

May 10, 2004: Mr. Crandall noted that Hamel was very upset after he and his son had an angry exchange of letters.  GAF was 57 (moderate).  (Tr. 1264)  June 2 to July 28, 2004: Mr. Crandall assessed Hamel's GAF at 54 and 55 (moderate).  (Tr. 1252-1253, 1256, 1259-1260, 1263)

August 4, 2004: Hamel saw Dr. Sood and reported on the favorable result in his Social Security appeal.  Dr. Sood assessed his GAF at 60 (moderate).  (Tr. 1243)

August 5, 2004:  A physical examination indicated that Hamel could walk at least two miles daily with no anginal symptoms.  The examination was essentially unremarkable.  (Tr. 1239)

August 10 to September 22, 2004:  Mr. Crandall assessed Hamel's GAF at 55 (moderate) for three counseling sessions.  (Tr. 1536, 1235, 1526)

September 28, 2004: Hamel underwent a left bunionectomy with a distal soft tissue procedure and proximal metatarsal osteotomy of his first metatarsal to correct a left hallux valgus deformity.  (Tr. 1524)

October 6, 2004: Mr. Crandall noted that Hamel's wife commented that she feels Hamel has bouts of despair, she feels frightened of him at those time and often wants to call the therapist to report on him.  She further stated that Hamel becomes agitated, will pace, and appears over alert/tense or on the defensive.  (Tr. 1523) October 20, 2004 to December 2, 2004: Mr. Crandall assessed Hamel's GAF at between 55 and 60 (moderate) during this period.  (Tr. 1519-21, 1523, 1516-1518, 1501-1506)

December 8, 2004: Hamel saw Dr. Sood and reported that he had been doing better and had just gotten off crutches following surgery to left foot, which had improved lots of things for him physically.  GAF was 60 (moderate).  (Tr. 1499-1500)

December 15, 2004, to March 30, 2005: Mr. Crandall assessed Hamel's GAF at between 54 and 59 (moderate).  (Tr. 1490-1498, 1467-1484)

April 8, 2005: Hamel saw Dr. Sood and reported that he was "doing pretty much the same" as his last visit.  Dr. Sood again assessed GAF at 60 (moderate).  (Tr. 1466)

April 13, 2005: Mr. Crandall noted that Hamel had a more pronounced limp. (Tr. 1463)  April 27, 2005: Mr. Crandall assessed Hamel's GAF at 59 (moderate). (Tr. 1460-1462)  May 18 to July 27, 2005: Hamel continued to see Mr. Crandall on a regular basis.   GAF ranged between 57 and 60 (moderate).  (Tr. 1596-1610) [4]

August 10, 2005: Hamel saw Dr. Sood.  GAF was 60 (moderate).  (Tr. 1589)

August 10 to November 2, 2005: Hamel's GAF ranged from 53 to 60 (moderate) while seeing Mr. Crandall for therapy.  (Tr. 1586, 1566-1580)

## B.  Supplemental Hearing Testimony

Hamel appeared and testified at an administrative hearing held on May 25, 2005.  (Tr. 1611-1666)  He believed that his most serious impairment was his low back impairment.  He stated: "My lower back is gone.  And as far as you know, the strength is there, you know, for you know the muscle strength is there. But the skeletal structuring and disc that serve the vertebra just, if I overdo it, even just walking, you know, my leg will go out due to neuropathy.  And I'll fall at times. . . I've had the constant discomfort, pain, in my lower back, my neck."  (Tr. 1625, 1629-1630)  Hamel testified that he has pain from the mid point of his back down into his tailbone and hips.  To relieve the pain he uses "meditation" and lies down for relief, on almost a daily basis, anywhere from an hour to three hours. (Tr. 1632-1633) He also complained of neck pain that caused severe headaches.  (Tr. 1625)  Hamel described neuropathy that sometimes caused him to fall.  He testified that his leg would go out on him and he would fall two to three times a week, from 1997 until six to eight months prior to the May 2005 hearing.  (Tr.1630)  Hamel was given a brace for his knee, but testified that it was uncomfortable and so he did not wear it as often

---

[4] This and subsequently listed evidence was submitted to and considered by the Appeals Council, but was not available to the ALJ when he issued his decision on October 20, 2005.

as recommended.  (Tr. 1631) He only wore it once or twice a month.  (Tr. 1631)
Hamel testified that he had seen a neurologist and an orthopedic surgeon and they
both said surgery on his back was not recommended because it would have no long
term benefit. (Tr. 1633)   Hamel testified that he could be up on his feet about two to
two and one-half hours out of any eight hour workday, and could sit for three hours
out of an eight hour workday.  (Tr. 1640)

        Hamel also discussed his therapy with Mr. Crandall.  (Tr. 1626)  Hamel stated
that he started therapy because he was tired of being angry and in pain.  (Tr. 1634)
There are  times he did not want to get out of bed. (Tr. 1634)   He stated that his
depression is really bad maybe two or three times a month, and mild daily. (Tr. 1634)
He had self-esteem issues because he could no longer work. (Tr. 1634) He had
considered suicide more than once.  (Tr. 1634)  Hamel reported that therapy had
helped how he defined himself. (Tr. 1635)   He said that he had gotten somewhat
reclusive and didn't want to be out in crowds.  (Tr. 1635)  He stated that he did not
handle stress well, and that the things that caused him stress included money matters
and his children.  (Tr. 1636)  He is worried about his oldest son who is handicapped
with severe mental retardation and has intermittent explosive disorder. (Tr. 1637-
1638)  Hamel  testified that the medications he took for his mental impairment were
85 percent effective.  (Tr. 1639)

        Hamel's wife also testified at the hearing.  (Tr. 1644)  She stated that Hamel
falls down at least once a week, sometimes more, due to his back; and he complains
of pain at least once a day.  (Tr. 1646)  She said that Hamel took medicine and would
lie down to ease his pain.  (Tr. 1647) Hamel's wife stated that his impairments had
affected his ability to do things around the house.  (Tr. 1647-1648)  He had trouble
sleeping and had become anti-social.  (Tr. 1648)  She testified: "Well, sometimes he
can't go to sleep. And sometimes he sleeps like it seems like forever.  Like he doesn't
want to get up that day.  He doesn't have a reason or whatever."  (Tr. 1648)  She said
this happens once or twice a week. (Tr. 1648)

-24-

A vocational expert (VE) appeared and testified at the hearing. (Tr. 1659) The ALJ described an individual such as Hamel, "someone the same age, education and past work history, both as to exertional as well as skill level. Any transferable skills that may come by virtue of that. And then with these further limitations and qualifications, that such a person could lift up to 20 pounds on a occasion, and 10 pounds on a frequent basis. Would be allowed to alternate pretty much at will with sitting and standing. But could probably sit up to 30 minutes at least at one time, and stand from 10 to 30 minutes as well. That such person should avoid cold and hazards such as heights and open machinery. That such a person could occasionally stoop and bend. I think he testified that he could stoop and pick things up off the floor. So that, to that degree. Certainly should not be climbing any kind of, of ladders, scaffolds or anything like that. Would have then also moderate limitations in the ability to perform within a schedule. To interact with the public. To accept instructions and respond appropriately to supervisors. To get along with peers and coworkers. And would have mild degree of problem in doing activities of daily living as well as social functions. And a mild limitation in the area of concentration, persistence and pace." (Tr. 1661-1662) The VE testified that such an individual could not perform Hamel's past relevant work, but could perform other work existing in significant numbers in the national economy, including light hand packager, sedentary hand packager, sorter, and assembler. (Tr. 1662)

The ALJ then asked a second hypothetical which was identical to the first, except that he changed the limitation on attention and concentration from "mild" to "often". The VE testified that with this change it would change her response, that Hamel would not be able to sustain work with this limitation, as a person could not meet the demands of production work. (Tr. 1663) Hamel's attorney asked the VE if there were one to two times a week Hamel would not get out of bed, whether he would be able to do any of the jobs identified. The VE responded: "If he weren't able to attend work one to two times a week, he would not be able to sustain work, and being acceptable." (Tr. 1664)

-25-

## C.  Consultative Examinations

At the close of the hearing, the ALJ indicated that since Hamel had not been examined by any Social Security examiners for an extended period of time, he would have him examined both physically and mentally. (Tr. 1665)

Mr. Hamel was examined by A. James Fix, Ph.D., on July 7, 2005. (Tr. 1537-1543)  Hamel told Dr. Fix that he was "supposed to tell him I'm insane," and that he was there due to "some more bureaucratic bullshit."  (Tr. 1537)  Hamel stated that he had "mild-to-moderate" depression. (Tr. 1538) On the mental status examination, Dr. Fix noted that Hamel seemed a bit bored and mildly distractive.  He never directed anger at Dr. Fix, but, outside of the interview room, he said some very angry statements. (Tr. 1540)  Hamel related that his daily schedule started when he arose around noon. (Tr. 1541) He did yard work, attended appointments, worked on model cars and airplanes, and sometimes did housework or repairs around the house. (Tr. 1541)  He watched television and played video games.  (Tr. 1541)

Dr. Fix administered the Minnesota Multiphasic Personality Inventory - II (MMPI-II), which yielded a "wildly abnormal" validity pattern and was invalid.  (Tr. 1541)  The test did, however, indicate, that Hamel was "attempting to describe all sorts of psychiatric disturbance and impairment, some of the contradictory, as a whole, virtually never seen altogether in one clinical disorder." (Tr. 1541)  Dr. Fix noted:  "It is possible that he is exaggerating symptoms in order to gain attention or services. Sometimes an individual involved in litigation will produce this exaggerated clinical scale profile in order to win his case." (Tr. 1542) Based on interview and testing, Dr. Fix opined that Hamel's main issue was a personality disorder rather than a primary psychiatric disorder.  (Tr. 1542)  His diagnosis was depression secondary to medical condition; possible unknown substance abuse; personality disorder, not otherwise specified, without any social features.  On Axis V, he reported a GAF score of current 45 (serious), highest in last year 55 (moderate). (Tr. 1542-1543)

Dr. Fix completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" form on July 7, 2009. (Tr. 1544-1546) He opined that Hamel's ability to understand, remember and carry out instructions was not affected by his mental impairment, and also noted that Hamel exhibited normal to above average cognitive abilities. (Tr. 1544) His ability to interact appropriately with the public, co-workers, and respond appropriately to work pressures was only slightly affected, but there was a marked restriction in Hamel's ability to interact appropriately with supervisors. (Tr. 1545) "Marked" was defined as: "There is serious limitation in this area. The ability to function is severely limited but not precluded." (Tr. 1544) Dr. Fix opined that Hamel would have no difficulty responding appropriately to changes in a routine work setting. (Tr. 1545) Dr. Fix noted that Hamel reported apathy which could reduce his effort on a job. (Tr. 1545) The Medical Source Statement form did not ask the psychologist for an opinion regarding Hamel's ability to concentrate.

On July 11, 2005, Hamel underwent a physical consultative examination with Jennifer Lynn King, M.D.  After examination and review of x-rays and an MRI, Dr. King assessed neck and back pain with some MRI findings and physical findings supportive of Hamel's claim.  She noted: "He has slight decreased range of motion with cervical extension.  He has significant crepitus with movement of his cervical spine.  He denied any pain to palpitation along the trapezius and complaints of mild pain to palpitation along the cervical vertebra.  He also complains of some pain to percussion along the lower lumbar vertebrae and on the paraspinus muscles bilaterally.  He has a positive straight leg raise bilaterally in the supine position and with testing and range of motion of the hips.  Actually with evaluation of the left hip, he complained of excruciating pain and then was minimally able to cooperate with the remainder of the examination including range of motion of the lumbar spine. . . . Two views of the lumbosacral spine were obtained.  He has mild spondylolisthesis. He has significant degenerative changes present. There is no evidence of compression fracture. Prior MRI was reviewed with last record being August 2003.  At that time, he had slight anterolisthesis of L5-S1 with bilateral spondylosis and he had a suspected L5 nerve root impingement."  Dr. King also assessed hypertension,

palpitations, and hyperlipidemia, all of which were controlled with treatment. Hamel told Dr. King that he felt his depression was "fairly adequately" controlled. Dr. King declined to complete the "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form, stating that she was not qualified or certified to perform this examination. (Tr. 1547-1552)

### D.  The ALJ's Decision

On October 20, 2005, the ALJ issued a decision finding that Hamel (1) has not performed substantial and gainful work activity since August 15, 1998; (2) has a depressive disorder, not otherwise specified, and discogenic and degenerative disorders of the spine; (3) does not have impairments that meet or equal any of the listings; (4) is unable to perform his past relevant work; and (5) has the residual functional capacity for other work that exists in significant numbers in the regional and national economies. (Tr. 1155-1156) Accordingly, the ALJ once again found that Hamel is not disabled, and "is not entitled to a period of disability or to the payment of disability insurance benefits under Title II of the Social Security Act, as amended." (Tr. 1156)

The ALJ also made a specific finding that Hamel's testimony, "insofar as it attempted to establish total disability, was not credible in view of the criteria set forth under 20 CFR 404.1529, Social Security Ruling 96-7p, and Polaski v. Heckler, supra." (Tr. 1156) In analyzing Hamel's credibility, the ALJ stated:

> At the hearing the claimant testified he is unable to work due to lower back problems, explaining that if he "over does it" when walking, his leg will go out from neuropathy and he will fall. In addition, he suffers from "neck problems" and experiences "calcification" of the cervical vertebrae which causes pressure and severe headaches. He stated he used to see a physician's assistant (PA) at the VAMC every 6 months, but is now seen once a year, due to the busy appointment schedules at the VA. He stated he sees Merrill Crandall for "counseling" and sees him about every other Wednesday. He first sought therapy with Mr.

-28-

Crandall in 1998.  Mr. Hamel explained he has had back problems since August 1998 and experiences "constant discomfort" and pain in the low back and neck.  He reported he has a knee brace but he does not wear it all the time as it "overheats" his leg.  He stated he is unable to stand at the sink and wash dishes very long without needing to sit down.  He has difficulty getting comfortable when sitting as he experiences sensations of numbness, tingling, and sitting on nails.  He explained his pain is exacerbated with over activity, climbing stairs, or walking.  Mr. Hamel reported he takes medication for pain and needs to lie down (anywhere from 1 to 3 hours) and tries to nap to make it work.  He reported his pain level affects his ability to maintain concentration and attention and that he always feels fatigued and will experience intermittent splitting head-aches and burning in his eyes.  He stated he has sought consultation with a neurologist and orthopedist regarding his back problems, and both specialists did not recommend surgery as they did not believe it would provide him with a "long term" benefit.  Mr. Hamel declared he decided to seek counseling through the VA because he had contemplated suicide in the past because he was tired of hurting and being angry.  He stated that since August 1998 he had experienced times when he does not want to get out of bed (i.e., approximately 2 to 3 times a month), but that since he started counseling with Mr. Crandall he does not experience as many thoughts of suicide.  He also reported being stressed and angry over financial and family matters and that his depression interferes with his sleep, contending he has not had a "restful sleep" in years due to pain.  He stated he has trouble completing things and that he gets distracted and forgets things.  Mr. Hamel stated he utilizes medication for his mental conditions and that he feels they are about 85% effective, adding he feels the effectiveness has increased lately.

Also testifying on behalf of the claimant was his wife, Ramona.  Mrs. Hamel testified that if the claimant stands or sits very long he will have pain.  She also stated he falls on a weekly basis.  Mrs. Hamel reported the claimant takes pain medication and lies down and will "meditate" to ease his symptoms.  He also finds walking around helps a bit.  She stated the claimant will try to wash dishes but it hurts his back.  He also will mow the grass, but it takes him a long time to complete. He uses a riding lawn mower to complete this task and usually mows for about 10 to 20 minutes and then will sit on the porch and have a cigarette and walk

around before continuing.  Mrs. Hamel stated the claimant is not very social and tries to avoid people.  She reported he continues to have anger problems and will scream and throw things.  She stated Mr. Hamel has problems with concentration and attention and will forget what he is talking about and that he often starts something and then becomes distracted and forgets what he was doing.  She reported the claimant's relationships with his sons are strained.  Mrs. Hamel explained the claimant gets angry about "every day" things, whether it's a bill they don't have money for, or if their puppy has an accident.  She stated the claimant watches television occasionally and that he will get up to stand or walk around during programs.  Mrs. Hamel declared the claimant underwent toe surgery last year and was required to wear a "boot" and use crutches.  Due to falling with the crutches, he was provided a wheelchair by the VA.  She explained that the claimant's legs go numb and he needs help getting off the toilet or out of the tub approximately 1 to 2 times a month.  She stated the claimant continues to pursue hobbies but not as much as he used to. They occasionally go to counseling together to discuss family and marital issues.

In the instant case, the record shows that the claimant's medically determinable impairments could reasonably be expected to produce the type of symptoms described during the course of his testimony. Therefore, in accordance with 20 CFR 404.1529 and SSR 96-7p, it must now be determined whether the claimant experiences such symptoms in such intensity, and of such frequency and duration, as would preclude all types of substantial and gainful work activity.  As noted previously, inherent in such analysis is an assessment of the claimant's credibility. The claimant has testified he is unable to work due to chronic back pain. He also experiences problems with depression.  Although the claimant does have medically determinable impairments, there is nothing in file to show these conditions are so severe as to preclude the claimant from all full-time work activity. Objective findings have failed to substantiate the intensity and persistence of his symptoms.  His symptoms of depression appear to be adequately controlled with medication, as do his complaints of pain.  He states he experiences pain on a constant basis, but this pain apparently does not keep him from making auto repairs and pursuing outside chores such as mowing the lawn.  Moreover, it is generally accepted that one who experienced the level of pain to which

-30-

the claimant testified, would be unable to perform other activities the claimant has[,] such as move furniture (See Exhibit 39F/216), walk up to 2 miles a day (See Exhibit 39F/35) without difficulties, go to the zoo with a handicapped child in tow (See Exhibit 39F/53), and perform auto repairs (See Exhibits 39F/60 and 39F/238). He states he frequently falls, but has been provided a knee brace to help with stability issues that he is not compliant with.  He states he has difficulty with sleep; however, this is inconsistent with progress notes from Mr. Crandall throughout the record. (See Exhibits 39F/172, 39F/194, 39F/207, and 39F/222). Although GAF Scale Scores have been shown to wax and wane throughout the record, overall scores have been found to predominately fall in the moderate range.  Mr. Hamel has reported he receives 100% disability from the VA and has acknowledged during therapy with Mr. Crandall that he "makes" more on disability than he would working.  It appears to the undersigned that perhaps rather than an inability to work, the claimant experiences a lack of motivation to work given the fact that his monthly disability pension amount is more than Mr. Hamel earned when was holding down a full time job. (See Exhibits 13F/17 and 39F/l86).  Moreover, the claimant states he experiences great stress regarding financial matters, but acknowledges he has used money which should have gone for bills on travel trips, tattoos, wedding rings, etc., rather than to pay off debts.  It would appear by the claimant's own actions and lack of restraint with proper financial practices, he creates a lot of his own stress.  He has received no permanent work restrictions from physicians other than a recommendation to lift no more than 40 to 50 pounds, and MMPI Scores in file indicate possible exaggeration of symptoms on the claimant's part. (See Exhibits 5F, 41F, and 42F). Although it is clear the claimant's residual functional capacity has been reduced and he is unable to return to past work, the undersigned finds Mr. Hamel retains the ability to perform work at the light and sedentary levels of exertion.

In view of the preceding discussion, the undersigned Administrative Law Judge finds that the claimant's testimony, insofar as it pertained to the inability to perform virtually any type of work activity on a sustained basis, was not credible.

(Tr. 1150-1152)

The only mention in the ALJ's decision of the "mental impairment evaluation" form that Mr. Crandall completed on March 9, 2001, is a statement by the ALJ that "[i]n this evaluation, [Mr. Crandall] documented the claimant's depression to be 'mild' and his prognosis was 'good.'" (Tr. 1145)  The ALJ completely failed to discuss Mr. Crandall's opinion that Hamel's depression often interferes with his attention and concentration.[5]  The ALJ found, without any explanation, that Hamel is only mildly limited in maintaining concentration, attention, or pace.

## II.  DISCUSSION

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001).  "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.*, at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result.  *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo. *Olson ex rel. Estate of Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995); *Smith*, 982 F.2d at 311.

---

[5]  In his original decision, the ALJ erroneously stated that Mr. Crandall had opined that Hamel's condition "seldom" interfered with attention and concentration. (Tr. 26)

-32-

### A.  Credibility Assessment

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions.  *Lowe v. Apfel*, 226 F.3d 969, 971-72 (8th Cir. 2000) (citing *Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984)).  The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole.  *Id.* at 972.  Where adequately explained and supported, credibility findings are for the ALJ to make.  *Id.* (citing *Tang v. Apfel*, 205 F.3d 1084, 1087 (8th Cir.2000)).

The ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledges and examines those considerations before discounting the subjective complaints.  *Id.* (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996)).  Even so, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence.  *Id.* at 738-39.

In the first appeal, the court found fault with the ALJ's assessment of Hamel's subjective complaints of back pain and leg numbness because the ALJ's decision did not contain an adequate (or even an accurate) discussion of Hamel's daily activities and the other *Polaski* factors.  Thus, the court stated:

> It is not evident why these few references to the record are inconsistent with Hamel's testimony that, despite taking medication, he experiences constant back pain and intermittent numbness in his left leg that prevent him from working full-time.  For example, the ALJ

mentions "several notes in the file referring to the Claimant working on repairing a vehicle." Hamel testified, however, that he maintains his cars "on a hobby level," working on them only for about an hour and a half at a time. (Tr. 68.) The other note referenced by the ALJ ("Currently works part-time repairing juice machines.") presumably is one made by the clinical social worker, Crandall, when Hamel started counseling sessions at the VA, on August 10, 1998. (Tr. 997.) This was before the alleged onset date of Hamel's disability, and other evidence in the record shows that he quit performing such work on August 15, 1998. (Tr. 226.) Hamel disputes that it took 3 hours to drive between Central City and Grand Island, which are located only 22 miles apart. He also observes that the trip to Texas took a week in a camper, and that the medical records reflect that he was "exhausted" following the 24-hour trip to Minot, North Dakota. (Tr. 382, 366.) Hamel testified that he is able to drive for about 2 hours at a time. (Tr. 76.)

"When an ALJ rejects a claimant's complaints of pain, he or she must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factors." *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998). "The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are [or are not] credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to have the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision." SSR 96-7p, 1996 WL 374186, at *4 (Social Security Administration, July 2, 1996).

-34-

While I cannot say that the ALJ's conclusion is necessarily wrong, neither can I say that it is well-reasoned. Thus, the case will be remanded for the Commissioner to perform a proper assessment of Hamel's subjective complaints. As I stated in *Callison v. Callahan*, 985 F.Supp. 1182, 1187 (D. Neb. 1997) (citing *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991): "[I]t is a tedious task to evaluate credibility. Nevertheless, unless an ALJ explains his views on credibility, in relation to each *Polaski* factor, with sufficient detail that a reviewing court can understand the logic of the ultimate credibility conclusion, there is nothing to review. Where an ALJ fails to give such an explanation, the error requires reversal."

(Case No. 4:03CV3196, filing 19 at 5-7.)

Hamel argues that the ALJ did no better on remand. He first challenges the ALJ's statement that "there is nothing in file to show [Hamel's impairments] are so severe as to preclude the claimant from full-time work activity" by pointing out that the Department of Veterans Affairs has determined that he is unemployable because of his physical condition. Although "a disability determination by the Veterans Administration is not binding on the ALJ," *Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir. 1996), it is "entitled to some weight and must be considered in the ALJ's decision." *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998). If the ALJ rejects the VA's finding disability, reasons should be given to enable a reasoned review by the courts. *Id.*

The ALJ's decision does not discuss the VA's findings. It merely notes that when Hamel was examined by Dr. Hrnicek in January 2000, Hamel "relayed [that] he was 100% disabled from the 'service' and that he had last worked in 1998" (Tr. 1143), and that when he was evaluated by Dr. Schuett that same month "he relayed once more that he was receiving 100% VA disability" (Tr. 1144). In his previous decision, however, the ALJ did note that "[t]he file contains a Department of Veterans Affairs rating decision dated August 3, 1998. The evidence considered was noted to be VA outpatient treatment notes from January 18, 1996 through October 2, 1997 and

-35-

a VA examination dated December 16, 1997.  Further, the decision noted that the
Claimant had been given a knee brace 'to prevent the knee from giving way.'  The
evaluator concluded, 'Evaluation of low back condition, to include neuropathy of the
left lower extremity, which is currently 20% disabling, is increased to 60% effective
March 20, 1997.' (Exhibit 3F)." (Tr. 22)  The ALJ discounted the VA's decision only
by stating that "the Social Security Administration is not bound by the findings of the
Veterans Administration regarding disability and the Social Security Administration
and the Veterans Administration define disability differently."  (Tr. 30)

While the ALJ should have specifically addressed the VA's decision, he did
at least review the underlying medical records in some detail.  (Tr. 21-22)  In a similar
case, _Pelkey v. Barnhart_, 433 F.3d 575, 579-80 (8th Cir. 2006), the Court of Appeals
held that such a review was sufficient, stating:

> Second, Pelkey contends that the ALJ failed to consider the
> disability assessment by the VA. We disagree. The ALJ should consider
> the VA's finding of disability, _Morrison v. Apfel_, 146 F.3d 625, 628 (8th
> Cir.1998), but the ALJ is not bound by the disability rating of another
> agency when he is evaluating whether the claimant is disabled for
> purposes of social security benefits, 20 C.F.R. § 404.1504; _Fisher v._
> _Shalala_, 41 F.3d 1261, 1262 (8th Cir.1994) (per curiam) ("There is no
> support for [the claimant]'s contention that his sixty-percent
> service-connected disability rating equates with an inability to engage
> in any substantial gainful activity under social security standards.").

> Although he did not specifically mention the 60 percent figure,
> the ALJ did not err because he fully considered the evidence underlying
> the VA's final conclusion that Pelkey was 60 percent disabled. The
> VA's 60 percent rating is found in an August 11, 2001, letter, while the
> evidence supporting that rating is located in the VA Rating Decision of
> August 6, 2001, which describes in detail a VA rating examination
> performed by Dr. Ky on May 22, 2001, and VA outpatient treatment
> reports, including x-rays of the spine taken on March 6, 2001, and the
> examination by Dr. Higley on June 28, 2001. The ALJ discussed the
> rating examination and Dr. Ky's diagnosis of low back pain with

-36-

degenerative changes at the L1, L2 and L5 levels of the spine and bilateral pes planus (flat feet). The ALJ also mentioned the treatment reports. In addition, the ALJ noted that the VA originally awarded Pelkey 20 percent disability for his back problems in 1985.

Pelkey argues that *Morrison* compels a different conclusion. Morrison held that the ALJ erred in giving no reasons for rejecting a VA rating of 100 percent disability because "an extensive physical examination documenting Morrison's medical problems, followed by a finding of a permanent and total disability by another government agency, all of which occupies some thirty pages in the record, merits more than simply an implicit rejection." 146 F.3d at 628. By contrast, here the ALJ did not ignore the VA rating but considered and discussed the underlying medical evidence contained in the VA's Rating Decision. The ALJ did not err in his consideration of the VA's disability determination.

Hamel next criticizes the ALJ's discussion regarding his daily activities, starting with the ALJ's statement that Hamel's pain "apparently does not keep him from making auto repairs and pursuing outside chores such as mowing the lawn." The record supports this finding, and the ALJ recited earlier in his decision that Hamel told Dr. Schuett in January 2000 that "his activities of daily living involved doing yard work, working around the house, working on cars, . . . [and] working in his garage" (Tr. 1144), that Hamel told Mr. Crandall on May 10, 2001, that he "was keeping 'busy' by engaging in auto repairs, etc." (Tr. 1145) and on August 1, 2003, that he "was staying busy 'working on his truck'" (Tr. 1146), that Hamel complained to Mr. Crandall on January 28, 2004, that "weather had not permitted him to do auto repairs" (Tr. 1146) and on April 6, 2004, that "the pickup he had rebuilt had broken down again and he had no money to continue to make repairs" (Tr. 1147), that Hamel reported to Mr. Crandall on June 2, 2004, that "he had been offered enough funds to get a rebuilt motor and was about to finish the installation in his vehicle" (Tr. 1147), and that Mrs. Hamel testified her husband "will mow the grass, but it takes a long time to complete . . . [using] a riding lawn mower . . . and usually mowing for 10 to 20 minutes" (Tr. 1151). Hamel states that the therapist's notes for June 2, 2004, show

-37-

that the couple had been without a vehicle for most of the year, and, consequently, that Hamel "has actually been walking into town– quite a number of miles– at times. This then provokes the back and leg pain– in fact, he has had some recent severe leg spasms– lasting for 4 or more hours."  (Tr. 1263)  This notation is not particularly helpful to Hamel's cause.  However, Hamel also references a note by Mr. Crandall on June 16, 2004, which states that Hamel was "excited about getting a truck to run– so there is transportation again. Yet, fearful that something will go wrong– both [Hamel and his wife] have decided if it does that he will not longer attempt home repairs– is causing too much trouble with his back and affecting his mood." (Tr. 1260)  To emphasize the limited amount of time he spends on these activities, Hamel recalls his testimony from the first hearing before the ALJ, when he indicated that he maintained his vehicles "on a hobby level," working on them only about an hour and a half per day (Tr. 67-68), and draws attention to his wife's testimony about his mowing for 10 to 20 minutes at a time, which was noted by the ALJ.  Mrs. Hamel also testified that they live on 3 acres of land, so considerable mowing is likely required – up to 2 hours a day, according to Mrs. Hamel.  (Tr. 1656)

With respect to moving furniture, the ALJ referenced Exhibit 39F/216, which is a notation made by a nurse practitioner on March 5, 2002, stating that Hamel "Moved to farmhouse - Moved furniture." (Tr. 1419)  Hamel testified at the hearing that "we relocated and that was the assistance of my wife and son. . . .  I do consider my back to be bad enough to where I shouldn't be moving furniture. I shouldn't be moving heavy objects.  But I fall back on a little bit of my Swedish heritage and I'm rather bullheaded. When I -- when people say they help me, and they don't help me. And then they don't show.  I still have to get things done.  And it took us two months to move everything."  (Tr. 1643)  While Hamel's brief describes this lengthy moving project as an "isolated instance" (Filing 13, at 16), it still is an inconsistency.  There is no evidence that Hamel experienced an exacerbation of pain requiring medical attention as a result of this activity.

-38-

Hamel claims that the ALJ should not have placed any emphasis upon Exhibit 39F/35, a doctor's notation dated August 5, 2004, in which Hamel reported that he "walks up to two miles a day without any difficulties." (Tr. 1238)  Hamel argues that walking is good exercise for the lower back.  In fact, Hamel stated in answers to interrogatories on January 10, 2005, that a doctor had recommended that he do more walking, that he could walk one mile before having to sit or lie down, and that during an 8-hour workday he could walk a total of 45 minutes.  (Tr. 1187-1188)  Hamel also testified at the first hearing that he could walk up to a mile at one time, and that he occasionally walked to the local grocery store.  (Tr. 64)  As noted by the ALJ, however, Hamel testified at the second hearing that "most times" his pain was aggravated by walking.  (Tr. 1632)

Hamel next criticizes the ALJ's statement that a person with severe back pain should not have been able to "go to the zoo with a handicapped child in tow."  The statement was made with reference to a notation made by Mr. Crandall on July 14, 2004, that Hamel was "[a]gain stressed with re to financial issues– brought the handicapped son home for the weekend– went to the zoo– cost was higher than expected." (Tr. 1256)  Hamel notes that his son is 25 years old and, although not established by the record, that they visited only a small zoo in Grand Island.  The ALJ did not question Hamel about the zoo trip.

Hamel attempts to excuse his failure to wear the knee brace regularly by stating that it is uncomfortable.  He admitted at the hearing that he does not wear the brace "as often as I should.  I wear it maybe once or twice a month.  And as I said, it's, it's very uncomfortable because of it's material it's made out of.  It just overheats my leg. . . . I tried to wear it more frequently in the past but the discomfort from the hear [sic] that that neoprene generated on my leg, just didn't -- it outweighs, it outweighs the benefit of wearing that brace." (Tr. 1631)  Considering that Hamel also testified that since 1997 he had been falling down "about two, three times a week, four times a week" (Tr. 1630), the ALJ was clearly justified in observing that Hamel "has been provided a knee brace to help with stability issues that he is not compliant with." (Tr.

1152)  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (quoting *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)). "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." *Id.*; *see also* 20 C.F.R. § 416.930(b).

The ALJ also noted that Hamel's testimony that he has difficulty with sleep "is inconsistent with progress notes from Mr. Crandall throughout the record. (See Exhibits 39F/172, 39F/194, 39F/207, and 39F/222)."  (Tr. 1152)  Hamel correctly points out that there are numerous entries in the medical records that directly support his testimony, but that were not identified by the ALJ, including: Exhibit 39F/231, a progress note by Dr. Sood on December 13, 2001 – "Patient says he is not sleeping well either." (Tr. 1434); Exhibit 39F/217, a primary care clinic note on March 5, 2002 – "Back is bothering - has to think about, States it keeps him awake at times." (Tr. 1420); Exhibit 39F/155, a notation by Dr. Sood on November 20, 2002 – "Mentions that he has hard time frequently falling asleep because of the pains and aches in his back and neck but once he is able to fall asleep he is able to get a few hrs of sleep then." (Tr. 1358); Exhibit 39F/138, another notation by Dr. Sood, on February 27, 2002 – "Mentions that he has hard time frequently falling asleep because of the pains and aches in his back and neck but once he is able to fall asleep he is able to get a few hrs of sleep then." (Tr. 1341); Exhibit 39F/82, a primary care clinic note on January 14, 2004 – "Back and leg pain has been a 5 to 7 - states that he cannot get to sleep because of the pain." (Tr. 1285); Exhibit 39F/64, a primary care clinic note, on May 6, 2004 – "Vet does not always sleep well, Jerks at night." (Tr. 1267); Exhibit 39F/43, a primary care clinic note on August 8, 2004 – "Back and leg pain has been a 5 to 7 - states that he cannot get to sleep because of the pain." (Tr. 1246); Exhibit 40F/65, a primary care clinic note on November 10, 2004 – "Not sleeping well due to decreased activity." (Tr. 1510); Exhibit 40F/59, a notation by Mr. Crandall on November 17, 2004 – "Did not sleep more than about one hour last night." (Tr. 1504); Exhibit 40F/15, a notation by Mr. Crandall on April 27, 2005 – "He mentions back pain, sleep problems, takes sleeping meds. Is very late when he falls to sleep,

-40-

then will sleep to noon." (Tr. 1460); and Appeals Council Exhibit 2/46, a notation by Mr. Crandall on June 15, 2005 – "Comes today stating that he had a restless night." (Tr. 1602).

The ALJ concluded "that perhaps rather than an inability to work, the claimant experiences a lack of motivation to work given the fact that his monthly disability pension amount is more than Mr. Hamel earned when was holding down a full time job." (Tr. 1152)  Hamel argues that this is not evidence of lack of motivation on his part because "it is the very nature of the VA benefit system, where any work at all results in a total loss of benefits, which creates a huge disincentive to work." (Filing 13 at 20.)  Hamel's argument is unpersuasive.

The ALJ did not merely rely on the fact that Hamel was receiving VA benefits. *See, e.g., McLean v. Barnhart*, No. 02-4085-JAR, 2004 WL 1212045, *5 (D.Kan. May 20, 2004) (ALJ erred by giving considerable weight to fact that claimant's receipt of VA benefits diminished his financial need to return to work); *Stonebraker v. Shalala*, 827 F.Supp. 1531, 1536 (D.Kan. 1993) ("The mere fact that plaintiff has received assistance from other sources, however, says nothing about the reasons plaintiff has remained unemployed, and it is equally probable that a bona fide disability accounts for plaintiff's 'poor motivation' to return to work."). *But cf. Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir.2004) (ALJ properly noted that claimant's incentive to work might be inhibited by her monthly long-term disability checks). Instead, the ALJ noted that Hamel "has acknowledged during therapy with Mr. Crandall that he 'makes' more on disability than he would working." (Tr. 1152) That is, Hamel's statements to his therapist implied that he could work if it was financially beneficial for him to do so.  Hamel revealed to Mr. Crandall on July 13, 2000, that "he feels he is in a double bind" because "he has been rated unemployable so if he did retrain it would be at his expense, and he can't afford to do that now. Additionally he would end his benefits and he makes far more than he would at most jobs." (Tr. 380)  On November 17, 2000, Hamel again told to Mr. Crandall that he "can't work as [that] will stop benefits." (Tr. 365) These statements are relevant

-41-

evidence that Hamel is not disabled.  *See Knight v. Social Sec. Admin.*, Case No. 8:07CV367, 2009 WL 929936, *4  (D.Neb. Apr. 1, 2009) (evidence that claimant's monthly VA benefits exceeded amounts he ever made while employed, and that he realized VA benefits would be reduced if he obtained employment, supported ALJ's determination that claimant was not motivated to work); *DuBois v. Barnhart*, 137 Fed.Appx. 920, 921, 2005 WL 1389067, *1 (8th Cir. 2005) (claimant repeatedly stated that he did not intend to return to work because his VA benefits would end if he did; ALJ rightly concluded that  "[s]econdary gain is a theme throughout this record.") (unpublished opinion); *Gaddis v. Chater*, 76 F.3d 893, 896 (8th Cir.1996) (claimant's statement to psychiatrist that "he can go out and find a minimum wage job at any time, but he is more worried about the future" supported ALJ's determination that there was a "strong element of secondary gain in this case" and that claimant's conduct belied a sincere belief that he was truly disabled).

Hamel next takes issue with the ALJ's statement that "[a]lthough GAF Scale Scores have been shown to wax and wane throughout the record, overall scores have been found to predominately fall in the moderate range." (Tr. 1152) Hamel states that even when his scores were in the moderate range, they were often at the low end.  For example, the VA records show that from August 31, 1998, through December 9, 1999, with one exception, all GAF scores were 52 or lower, with several scores in the serious range; from October 2, 2001, to through June 11, 2002, with one exception, all GAF scores were 53 or lower, again with several in the serious range. Hamel concedes that "[t]here has been some improvement since then" (Filing 13 at 19), but notes that on July 7, 2005, Dr. Fix examined him and assessed a GAF of 45, in the serious range.  (Tr. 1543)

Finally, Hamel complains that the ALJ failed to explain why he is not a credible witness just because "he creates a lot of his own stress" regarding financial matters by "us[ing] money which should have gone for bills on travel trips, tattoos, wedding rings, etc." (Tr. 1152) The Commissioner does not address this particular complaint, but notes that Hamel knowingly wrote insufficient funds checks in order

-42-

to purchase gifts or other nonessential items (Tr. 483, 1432), which behavior "reflects negatively on Plaintiff's veracity." (Filing 18 at 26.)  Significantly, Hamel does not challenge the ALJ's statement that "[h]e has received no permanent work restrictions from physicians other than a recommendation to lift no more than 40 to 50 pounds, and MMPI Scores in file indicate possible exaggeration of symptoms on the claimant's part.  (See Exhibits 5F, 41F, and 42F)."  (Tr. 1152)

In *Draper v. Barnhart*, 425 F.3d 1127 (8th Cir. 2005), the Court of Appeals held that an ALJ was wrong to discount complaints of pain by a claimant with degenerative disk disease of the lumbosacral spine whose activities of daily living involved some light exertional activities, such as household chores, laundry, grocery shopping, mowing, and other chores.  The Court explained:

> The fact that Draper tries to maintain her home and does her best to engage in ordinary life activities is not inconsistent with her complaints of pain, and in no way directs a finding that she is able to engage in light work.  As we said in *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc), the test is whether the claimant has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  In other words, evidence of performing general housework does not preclude a finding of disability.  In *Rainey v. Dep't of Health & Human Servs.*, 48 F.3d 292, 203 (8th Cir.1995), the claimant washed dishes, did light cooking, read, watched TV, visited with his mother, and drove to shop for groceries.  We noted that these were activities that were not substantial evidence of the ability to do full-time, competitive work.  In *Baumgarten v. Chater*, 75 F.3d 366, 369 (8th Cir.1996), the ALJ pointed to the claimant's daily activities, which included making her bed, preparing food, performing light housekeeping, grocery shopping, and visiting friends.  We found this to be an unpersuasive reason to deny benefits: "We have repeatedly held . . . that 'the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.'" *Id.* (quoting *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir.1995)).  Moreover, we have reminded the Commissioner

-43-

> that to find a claimant has the residual functional
> capacity to perform a certain type of work, the claimant
> must have the ability to perform the requisite acts day in
> and day out, in the sometimes competitive and stressful
> conditions in which real people work in the real world. . . .
> The ability to do light housework with assistance, attend
> church, or visit with friends on the phone does not qualify
> as the ability to do substantial gainful activity.

*Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted).

*Id.*, at 1131.  By contrast, in *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008), the Court of Appeals deferred to an ALJ's determination that a claimant with mild degenerative changes to her back was not credible, stating:

> Next, we find that the ALJ did not err in discounting Steed's credibility.
> As previously noted, the ALJ's conclusion that Steed's medical evidence
> did not support the extent of her reported limitations is supported by
> substantial evidence. There is also substantial evidence for the ALJ's
> observation that Steed's reported daily activities were inconsistent with
> her self-reported limitations. Steed reported that she could only stand for
> fifteen minutes, sit for one to two hours, and lift a half gallon of milk.
> However, Steed also reported that she could perform housework, take
> care of her child, cook, and drive. . . .
>
> This case illustrates the importance of our standard of review in
> social security disability cases. While there is a significant amount of
> medical evidence in the record, it appears that substantial evidence
> would support both the ALJ's conclusion that Steed was not credible,
> and Steed's argument to the contrary. However, the ALJ was able to
> observe Steed during her testimony at the hearing, and this, in addition
> to the voluminous medical evidence, convinced the ALJ that she was not
> fully credible and could perform light work. The ALJ is in the best
> position to make this determination, *Ramirez v. Barnhart*, 292 F.3d 576,
> 581 (8th Cir. 2002), and we cannot say the ALJ erred in doing so.

In the present case, taking both of the ALJ's decisions into account, it appears on the whole that proper consideration was given to Hamel's subjective complaints of back pain and leg numbness, and the ALJ's determination that Hamel's testimony was not credible will be given deference. *See Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination."). In this respect, therefore, the Commissioner has complied with the court's remand order.

Hamel additionally claims that reversal is required because the ALJ did not discredit his wife's testimony at the second hearing. In particular, Hamel notes that his wife testified that he "has problems with concentration and attention" and "did not get out of bed due to his depression, one or two times a week." (Filing 13 at 25.)[6] The

_____

[6] Mrs. Hamel's actual testimony was as follows:

Q  Does [his depression] interfere with his sleep?
A  Oh, yeah.
Q  In what way?
A  Well, sometimes he can't go to sleep.  And sometimes he sleeps forever.  Like he doesn't want to get up that day.  He doesn't have a reason or whatever.
Q  How often does, does that happen that he doesn't want to get up?
A  I don't know.  I, I would say maybe once, twice a week.
* * *
Q  Does he have any difficulty maintaining concentration and attention?
A  I think so.
Q  Can you give an example of that?
A  Well, sometimes, we'll talk about something, and, and then he you know, there might be some word that I don't understand.  And I say what does that mean?  And then he goes off to you know, explaining the word.  And then he forgets all about what we were talking about in the first place or sometimes he leaves the room and comes back.  And I'm

-45-

Commissioner concedes that "[w]hile the ALJ did specifically discuss Plaintiff's wife's testimony, he did not perform a separate credibility analysis (Tr. 1151)." (Filing 18 at 27.)  But an ALJ's failure "to explain why evidence from lay persons was rejected . . . does not always result in a remand." *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008).  "For example, [the Court of Appeals has] sometimes concluded that third-party evidence supporting a claimant's complaints was the same as evidence that the ALJ rejected for reasons specified in the opinion. In such circumstances, [the Court has] refused to remand based on an 'arguable deficiency in opinion-writing technique' that had no effect on the outcome of the case. *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995)." *Id.* (reversing and remanding because ALJ's decision did not say that third-party statements were considered at all).

Hamel testified that "[a]t times I'm just, I'm in such a funk, I don't even want to get out of bed."  (Tr. 1634)  He stated that this happens "[m]aybe two or three times a month when it's really bad."  (Tr. 1634)  The ALJ cited this testimony in his decision.  (Tr. 1151) The ALJ did not specifically discredit this testimony, but did find that Hamel's "symptoms of depression appear to be adequately controlled with

---

like what were you doing?  And he'll say, well, I was going to do something, but I forgot.  That may be you know, that's age, I don't know.
> Q Does he have any problems completing things that he starts?
> A Sometimes.  Yeah.
> Q Such as?
> A Well, like I -- I don't know if that has to do with his memory. You know, he starts doing something and then he you know, goes off. Like he wants to get something and then he sees something else that, that he wants to do and stuff, and then forgets, forgets all about the first thing.

(Tr. 1648-1649)

medication" and stated that "[a]lthough GAF Scale Scores have been shown to wax and wane throughout the record, overall scores have been found to predominately fall in the moderate range." (Tr. 1152) While the vocational expert testified that it would not be acceptable for Hamel to miss work once or twice a week, Hamel and his wife merely testified that there were days when he did *want* to get out of bed, not that he was unable to. As Mrs. Hamel stated, it is like he "doesn't have a reason" to get up. (Tr. 1648) Hamel also indicated in answers to interrogatories that on normal day he does not get up until "between 10:00 a.m. and noon." (Tr. 1190) The ALJ's failure to separately analyze the credibility of Mrs. Hamel's testimony about her husband's depression was harmless error.

With respect to her testimony about Hamel's difficulties in concentrating or remembering, the ALJ stated in the decision that Hamel himself testified that "he has trouble completing things and that he gets distracted and forgets things." (Tr. 1151) The ALJ did not specifically discredit this testimony, but simply made a finding that Hamel "experiences mild limitations in . . . maintaining concentration, persistence, or pace." (Tr. 1153) This is a change from the original decision, in which the ALJ found that Hamel had "no difficulties in maintaining concentration, persistence and pace." (Tr. 33) The revised finding of a mild limitation in concentration is not necessarily at odds with the Hamels' testimony, which did not go into any detail regarding the severity of the problem. As will be discussed below, however, the ALJ's finding of a mild limitation is inconsistent with the clinical social worker's opinion that Hamel often has difficulty concentrating.

### B. Clinical Social Worker's Opinion

In the court's previous memorandum and order, it was determined that the ALJ had committed reversible error by misstating Mr. Crandall's opinion and finding no limitation in Hamel's ability to concentrate. The court carefully explained why the case was being remanded for further proceedings on this issue, stating:

-47-

The ALJ's decision states that the clinical social worker, Crandall, opined in a "mental impairment evaluation" form that Hamel's depression "seldom" interfered with attention and concentration. (Tr. 26.) In truth, it was Crandall's opinion that depression "often" interfered with Hamel's attention and concentration. (Tr. 960, 994.) Significantly, when Hamel's attorney asked the VE whether inclusion of this fact in the ALJ's hypothetical question would cause him to change his answer regarding Hamel's ability to work as a dispatcher, a phone solicitor, or a cashier, he testified: "Yes, it would. . . . It would eliminate the jobs." (Tr. 84.)

The Commissioner argues that the ALJ's error was harmless because a clinical social worker is not an "acceptable medical source" under the regulations, and because Crandall's opinion is inconsistent with his finding that Hamel's depression is "mild." (Tr. 958, 993.) While it is true that clinical social workers are treated as "other" sources, this only means that Crandall's opinion cannot be used to establish that Hamel has a medically determinable impairment. *See* 20 C.F.R. § 404.1513(a). His opinion is relevant to show the severity of Hamel's impairment and how it affects his ability to work. S*ee* 20 C.F.R. § 404.1513(d). *See also Shontos v. Barnhart,* 328 F.3d 418, 426 (8th Cir. 2003) (nurse-practitioner and certified therapist were both appropriate sources of such evidence.) Considering that Crandall has counseled Hamel regularly (about twice a month) since August 1998, his opinion could be particularly important. *See, e.g., White v. Commissioner*, 302 F. Supp. 2d 170, 176 (W.D. N.Y. 2004), (ALJ failed to give appropriate weight to report of social worker, the sole source who had a regular treatment relationship with the plaintiff); *Ribar v. Barnhart*, 199 F. Supp. 2d 917, 921 (S.D. Ia. 2002) (ALJ should have considered social worker's opinion where she had been treating the plaintiff on a regular basis for more than one year, which arguably placed her in a better position to evaluate the plaintiff's day-to-day condition than two psychiatrists).

Crandall's categorizing Hamel's depression as "mild" does not necessarily negate his opinion that the condition often interfered with Hamel's attention and concentration. Crandall's notes reflect that from August 31, 1998, through April 6, 1999, he scored Hamel's global

-48-

assessment of functioning (GAF) at 45 (Tr. 468-98), which reflects "serious" symptoms or "serious" difficulty in social or occupational functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994). From April 12, 1999, through December 27, 1999, he generally scored Hamel's GAF at 51 (Tr. 403-65), which reflects "moderate" symptoms or impairments. *Id.* From January 4, 2000, through March 21, 2000, he assigned a GAF score of 55 (Tr. 386-99), which is also in the "moderate" range. Between June 26, 2000, and December 28, 2000, the GAF score varied between 51 and 55 (Tr. 364-85, 1049-50). On January 18, 2001, Crandall increased the GAF score to 60 (Tr. 1048), still within the "moderate" range. On February 2 and 13, 2001, however, the GAF score was raised to 61(Tr. 1046-47), which reflects that Hamel had "some mild symptoms" or "some difficulty" in social or occupational functioning," but that he was "generally functioning pretty well." *Id.* On February 27, 2001, the GAF score was again reduced to 55 (Tr. 1045). Hamel's psychiatrist, Charles P. Sprague, also gave him an "unchanged" GAF score of 55 following a visit on March 5, 2001 (Tr. 1044.) Crandall's completed the "mental impairment evaluation" form a few days later, on March 9, 2001. Between June 14, 2001, and November 19, 2001 (Tr. 1017, 1091-1114), Crandall assigned Hamel GAF scores ranging from 51 to 57. On December 5, 2001, however, Crandall noted a "major drop in GAF functioning" and assigned a score of 42 (Tr. 1079). This notation constitutes the most recent information in the record concerning Hamel's depression.

The ALJ, of course, found that Hamel's depression was a "severe" impairment for purposes of the Social Security Act. One may question why the ALJ made this finding after stating that Hamel's condition has resulted in only "mild restriction of activities of daily living, mild difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence and pace[,] and no episode of decompensation of extended duration" (Tr. 30),[7] but, having made the

---

[7] According to 20 C.F.R. § 404.1520a(d)(1), if the claimant's degree of limitation is rated as "none" or "mild" in the first three functional areas, and as "none" in the fourth area, then it generally will be concluded that the impairment is not severe unless the evidence otherwise indicates that there is more than a minimal

finding, it was incumbent upon the ALJ to consider all relevant evidence – including Crandall's opinion – in assessing Hamel's residual functional capacity. For reasons that are not explained, the ALJ found that Hamel has "moderate" limitations in his ability to perform activities within a schedule, maintain regular attendance, and be punctual; to interact with the public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers without exhibiting behavioral extremes. (Tr. 30.) The ALJ did not find any limitation in Hamel's ability to maintain attention and concentration for extended periods.[8]

In view of the obvious disparity between the ALJ's mental residual functional capacity assessment and Crandall's mental impairment evaluation, and considering the importance that the vocational expert placed upon Hamel's ability to pay attention and to concentrate while working as a dispatcher, phone solicitor, and cashier, the Commissioner's decision is not supported by substantial evidence. Remand for further proceedings is therefore required.

(Case No. 4:03CV3196, filing 19, at 7-9.)

On remand, the ALJ questioned a different vocational expert whether a person with Hamel's other impairments would be able to do light or sedentary work as a hand packager, sorter, or assembler[9] if he often had difficulties maintaining attention and concentration. The VE opined that such a person would not be able to sustain work. The testimony was as follows:

---

limitation on the claimant's ability to do basic work activities.

[8] This particular mental activity is part of the "sustained concentration and persistence" section of the standard mental RFC assessment form. *See, e.g.*, Exhibit 7F (mental RFC assessment completed by a state agency consultant on April 2, 2000), at Tr. 305.

[9] These were the occupations that the second vocational expert identified as being suitable for a person with Hamel's impairments as found by the ALJ, including a mild limitation in the ability to concentrate.

Q [by the ALJ] . . .  Then as a second hypothetical, the only thing I want to change would be that if the person as far as concentration and attention was concerned.  If that would often interfere with the attention and concentration due to his mental condition or physical condition or a combination of both.  Since this is simple unskilled work.  Would that really make -- would that make any difference in this hypothetical from the first?

A  Yes, it would.

Q  And to what degree?

A  I don't believe he would be able to sustain work.

Q  And why would that be so on, on simple repetitive type work?

A  The occupations which I indicated a production type work, and require generally some quotas.  There are expectations on productivity.  If you are not concentrating or paying attention to what you're supposed to be doing, you couldn't meet the, the demands.

(Tr. 1663)

Despite this expert testimony, the ALJ's decision on remand does not mention Mr. Crandall's opinion.  It does not even point to any contradictory medical evidence.  What is more, the consulting psychologist who examined Hamel subsequent to the hearing on remand, Dr. Fix, was not asked to give an opinion regarding Hamel's ability to concentrate.  As before, the ALJ's no-disability determination is not supported by substantial evidence, and reversal is required.  The court will again remand for further proceedings, but this time will expressly direct the Commissioner to request Mr. Crandall to provide additional information or clarification regarding his March 9, 2001 opinion that Hamel's depression often interferes with his attention and concentration.  *See* 20 C.F.R. § 404.1512(e) (recontacting medical sources).  Considering that Hamel has not been gainfully employed since August 15, 1998, the Commissioner is respectfully urged to expedite proceedings on remand.

-51-

### 3.  Dr. Fix's Opinion

Although not mentioned in the ALJ's decision, Dr. Fix did opine as a result of the post-hearing psychological evaluation that Hamel would be markedly limited in his ability to deal with supervisors.  The ALJ erred by ignoring this opinion, which conflicts with the ALJ's assessment that Hamel is only moderately limited in this area. "The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  Social Security Ruling 96-8p, 1996 WL 374184, *7 (S.S.A. July 2, 1996).  Hamel contends that the ALJ also should have sent written interrogatories to the VE to inquire if this limitation would change the VE's testimony.  Unless the ALJ had a legitimate reason to reject Dr. Fix's opinion, the court agrees.  "It is well-settled that the 'ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.'"  Scott ex rel. Scott v. Astrue,  529 F.3d 818, 824 (8th Cir. 2008) (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)).

### III.  CONCLUSION

In the court's previous memorandum and order, the ALJ was instructed that if he chose to disregard Mr. Crandall's opinion on remand "he should detail his reasons for doing so." (Filing 19, p. 10, in Case No. 4:03CV3196.)  Because the ALJ failed to comply with this directive, the case will again be remanded for further proceedings, and the Commissioner will be directed to develop the record by making additional inquiries of Mr. Crandall.  Dr. Fix's opinion regarding Hamel's ability to interact appropriately with supervisors must also be examined further on remand.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document, providing that the Commissioner's decision is reversed and the cause remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

May 18, 2009.                    BY THE COURT:

                                 s/ *Richard G. Kopf*
                                 United States District Judge